Good morning, Your Honors, Lionel Lavenue from Finnegan for the TCL Appellates. We have three issues this morning in our appeal that are most important. One is the 101 issue of eligibility, two is the issue of damages and it's a proper computation and three is willfulness. If the first issue is resolved, then there's no need to go to the two other issues, so I'll take the first issue first. Can you speak first about the waiver of the 101 issue? Yes, Your Honor. We believe that the waiver issue has now been resolved by the SRI decision. In SRI, the court found that if there is a... Well, which circuit law applies here, Federal Circuit Law or Fifth Circuit Law? We believe that it's the Federal Circuit Law that applies and that that was the law that was applied in SRI. From our reading of footnote number five in SRI, the court cited to three circuits for the review of a Third Circuit case and they cited first to the Federal Circuit case law in United Tech, second to the Seventh Circuit case law, and third to the Tenth Circuit case law. There was no citation to the Third Circuit in that ruling, which was a ruling on a case from the Third Circuit. So it appears to us that... Do you think it was a contested issue in SRI as to which circuit law applies on this kind of procedural question of, you know, what does it take to preserve an argument in a denial of a summary judgment? It certainly does not appear that it was the direct issue that is in this case, where it is disputed as to which circuit law applies, the appellee claiming that it's the Fifth Circuit. But we believe that because we're talking about the issue of a review of summary judgment on 101, that that is an issue particular to Federal Circuit Law. That's not an issue that the Fifth Circuit would ever consider because it's Section 101. Whether or not you have to file a JMOL on Section 101 when you had a previous motion for summary judgment on 101 that had a final ruling, we believe that that would bring it within the Federal Circuit case law of Arrow Products and Accenture, both of which say that it is an issue that's particular to the Federal Circuit, that Federal Circuit Law would apply. However, even if we're wrong and we're misreading SRI, we believe that we would still win even applying Fifth Circuit Law. Fifth Circuit Law, there is, of course, the Fell decision, which was brought to light during the briefing, but the Fell decision did not overrule Hudson and Winn, and both of those Fifth Circuit cases support our position that if you have a ruling on a motion for summary judgment and that there's a final ruling on that, that you do not have to bring that up again on JMOL in order to have a decision reviewed by the appellate proceeding. So either under the Federal Circuit case law or under the Fifth Circuit case law, we would submit that we are fine under the waiver issue, but specifically under SRI that we are... Those other Fifth Circuit cases, the ones that are not Fell, the issue that got denied summary judgment, was that an issue that was different than the issue that went to the jury? For example, in Fell, I think it was a contract question that was resolved or that was addressed at summary judgment and then continued on and went to the jury. Here we have a 101 issue, but then we have all these other issues that actually went to the jury that are not 101, completely separate and distinct from 101, infringement, willfulness, damages, et cetera. So what I'm trying to figure out about these Fifth Circuit cases that you're pointing to that are not Fell, were they more like our fact pattern here where it was a separate and distinct issue that was addressed at summary judgment apart from all the issues that were addressed and resolved at the jury trial? We do read at least Hudson that way, Your Honor. But also the other key part is that in Hudson, since it wasn't a patent issue, then that also makes it completely different from anything that we would find in the Fifth Circuit because they simply have not addressed 101. So we would find that Hudson completely supports this. When is not directly on point, but it does show that there was no waiver applied, but it doesn't go into the substance that Hudson does. So we believe that Hudson does provide that outlet to Fell that we're looking for if the Fifth Circuit law does apply. But if we do survive the waiver issue, Your Honor, then we would get to the substance of 101, and we believe that there's basically three reasons why we would find these patent claims to be eligible. There's only two claims at issue, and the two claims first is that there was a nose of wax issue. And basically in the 101 argument that was made by Erickson to the court in trying to overcome the 101 ruling on motion for summary judgment, there was an argument that these claims were to be construed narrowly, that there was a middleware, there was a layered architecture, and other specific items that came from the IPR proceedings, and they were saying, so you should, Your Honor, Judge Payne, you should consider these very narrowly. However, when the claims were taken to the jury, the nose of wax was completely changed in that the same arguments were widened out, and the jury was told, well, no, you don't have to necessarily find middleware. It's in the title of the patent. It's not in the claims. Do you understand the difficulty that we have on appellate review of something like that? I mean, the district court decided the 101 issue as a threshold issue properly, and no one's challenging that. And he relied, rightly or wrongly, but even let's assume it's right, on the IPR. There's not much analysis in his 101 opinion, but one of the things he seems to have relied on heavily is the PTO's, what he calls the PTAB's, highly technical characterization of the claims. So is it your view that he was just wrong to rely on that? It's kind of harder for me to absorb. Well, he may have been right, but then it turned out at trial that the issues kind of changed, and that's just really hard for me to sort of absorb. But that seems to be your argument, right, that he may have been – are you conceding that he may have been right if they stopped there, but he's not right because during the trial here and what they presented to the jury, they changed their theory from what it had been before the PTAB? We're not saying that the judge was right. We're just pointing out the inconsistency of the arguments by Erickson. As far as the judge's ruling, the judge, we believe, got it wrong in two ways. One, the judge kept repeating the fact that the patent office, the PTO, had already reviewed the claims and found them to be patentable. But, of course, 101 was not subject to review at the patent office. So that's one of the things that we're not sure that the court fully understood. Secondly, the court also talked about the technical words that were in the claim, and he said, well, there's so many technical words, it must be eligible. Well, that goes against smart systems and all the case law of this court, which is technical jargon, technical words alone cannot make a claim eligible. You have to go beyond what the technical words are. And then when we look at the inconsistency in how the claims were interpreted by Erickson between the 101 motion and the jury, that confirms what we're explaining, which is these technical words, when you look at them all, they fall together into one thing, and that is access. There's a picture in our brief of having a doorway. You come up to the doorway, you let the door open, you have the door closed. There are basically four main elements in the claims. There's an access controller, an interception module, a decision entity, and a security access manager. The claims themselves say that two of these four elements are the same, that is the security access manager and the decision entity. And this is explained in Appendix 134, which was before the jury. However, also interestingly, the expert, when explaining the claims to the jury, said that the interception module and the decision entity could also be combined and be the same, and that's Appendix 1231. So when we take all of these elements and collapse them together, really we have nothing more than an access controller allowing access to information, the door opening or closing. And this court in Smart Systems, Accenture, Smartfish, and Prism, all of these cases have explained that merely having access to data, the door opening or closing, that is not enough. We have to have something more. Now my friends from Ericsson, they point to Enfish, Atrix, Data Engine, and the new case, Ancora. All of these cases do say that you can have claims that are patent eligible, but they have to have something more than just this access concept. They have to have, for example, a data structure of Enfish, something tangible. And that's why under either Alice 1 or Alice 2, these claims would not be eligible. Can I just turn you, because the clock is running to the damages question. So the play here was that the district court originally thought there was a problem, and then he reconsidered it and went back. And I looked briefly at the briefing with respect to those different scenarios, and it wasn't clear to me from the briefing why he changed his position. So do you have anything that's in the record that would enlighten that? The two things that the judge did that we believe led to the reversal of the decision to reconsider are twofold, and frankly, we believe that they're based upon a misreading of power integrations and laser dynamics. Because in power integrations and laser dynamics, as the court knows, it makes clear that you have to have an apportionment. And that was one of the main arguments that was in the briefing on the motion for a new trial, which the judge originally granted. He then reconsidered and decided against that for two reasons. One reason is he said that TCL had not focused on what other patented features there were of record to show apportionment. Well, TCL didn't need to show that there were other patented features. We only needed to show that there were other features to the phone. So we have a phone, which even Erickson's expert admits has thousands of features. And Erickson's expert also admitted that there are certain must-have features, for example, a microphone, camera, and other things that he noted, Bluetooth, and so forth. So of these thousands of features, there was no apportionment. So Judge Payne, he incorrectly understood that it was not other features but other patented features, and he said, well, because TCL had not shown there were other patented features, then he changed his mind. The second thing that he pointed to was royalty stacking. And, again, we believe it was a confusion on the part of the court in the Eastern District of Texas where he said, well, because you could have more than one patented feature to be licensed, then you could have royalty stacking, and there's not enough evidence on that. That wasn't our argument. Our argument, there was a failure of apportionment, not that there was an issue with royalty stacking. So those were the two errors that he, the two erroneous approaches that he used in reversing his decision to have a new trial. But we believe that there are basically two main reasons why the damages are incorrect. I can't recall. Did Judge Payne at all point to the price sensitivity and willingness to pay theories that were represented in that one chart? Not at all, Your Honor. Did Ellinger Jamel? No. No, Your Honor. The first time that the alternative two theories were brought up was in the motion for reconsideration on the new trial on damages. And under the Projima case written by Your Honor, if you don't bring an argument in the jury trial, and they didn't even bring it until after the reconsideration, you cannot bring it late. So basically what we believe happened is we brought our Jamel on the damages issue. They saw they had an issue, which was on their primary theory, which is willingness to buy. And then they tried to bootstrap these additional arguments, price sensitivity and willingness to buy, which were never presented. Now, my friend from Erickson may get up here and say, well, the jury did see our survey. And on our survey, the words, these words, price sensitivity and willingness to buy, were on the survey. Problem is, is under the Witserv case, this court has made clear that the jury has to have guideposts. It has to have something to say, aha, there's the alternative theory. Well, there was no argument, no presentation, nothing that was presented to the judge or the jury until the motion for reconsideration on these alternative theories. Now I'm confused. You say the jury has to have guideposts, but it's not your responsibility to bring forward a guidepost that would affect the findings in your favor? Well, since we only had one argument that was presented, it was the willingness to buy theory, then we only responded to that theory. The other two theories were never argued, asserted. They could have solved the problem by saying, ladies and gentlemen, or they could have asked their expert. You're saying it's their responsibility to raise an argument that favors you? It's their responsibility to raise their argument. These were their three alleged arguments. They picked one, and they did not use the other two. So it's only our responsibility, because they have the burden of proof, to respond to their arguments. So you remain silent, and what's the jury supposed to think? Well, the jury only had one argument presented, and that's the argument that we responded to. They did not argue the other two. Yes, what's the jury supposed to think? Therefore, they decide, they take a position that you're now telling us we need to rethink and reconsider? Well, we don't think that the jury would have anything to think, because the jury would not have even considered these alternative theories because they were never presented. So we don't think the jury would have had that. They're going to argue it was on a piece of paper, but that piece of paper was never presented in any way. In fact, when the jury saw the highlighted survey, which is a one-page survey, they focused in on only one portion of the survey, and that's the willingness to buy. There's a chart in Erickson's brief. This is an adversary system. I'm sorry? This is an adversary system. There are perhaps arguments on your side, but if they weren't presented to the jury, it's not in keeping with the jury system to ask us to rethink what should have been before the jury. Well, I'm certainly not asking that you rethink what was before the jury. I'm only asking you to consider only what was before the jury, and the only thing before the jury was one theory, and that's the willingness to buy theory. And under Projima and Witzer, that would not be something that the jury had considered because they were not told about it. They can't consider it if they haven't been told. But that theory supports the verdict. That theory still does not support the verdict. Thank you, Your Honor, for asking about that, because that theory, the alternative two theories, are still based upon the erroneous survey, which did not have appropriate apportionment. That's a very important fact. The survey is erroneous under all three theories, not just the first theory, so all the arguments in our brief as to why the survey is incorrect for failing to apportion, those arguments are applicable to all three. So the same defect affects the entire survey. Thank you. Good morning, and may it please the Court. Turning first to damages. Erickson presented as the crux of its damages model, its damages theory, a hypothetical negotiation. An economist testified that in the hypothetical negotiation between Erickson and TCL, there would be a bargaining range, the top of which would be $3.42, and the bottom of which would be something above zero. Yeah, but the whole basis for this is this 28%. So, right? I mean, the 28% is pivotal to the... No. No? No, it's not. Okay. That's the only testimony I saw during trial. Is that fair to say? That was the only testimony during trial, yes, but... Did anybody ever say $3.52 at trial? No. But there was a document that was admitted into evidence by agreement of the parties, pre-admitted before the trial. It is in the evidentiary record, PX 109, page 4. It's at page 5261 of the appendix. That document was relied upon by Erickson's expert, which is in the prior page of the appendix, 5256. The expert calculated the top end of the bargaining range in the hypothetical negotiation based on both willingness to pay and willingness to buy survey inputs. He used both of those. And the document that provides the predicate for that was a pre-admitted document. It is entitled to equal dignity as testimony when a reviewing court is looking at sufficiency of the evidence. We can't ignore an admitted trial exhibit that was shown to the jury. If I was to accept the idea that willingness to buy, price sensitivity, and willingness to pay are three separate theories, three separate models for the damages, then I don't see how you get to now utilize those two other theories that were never actually presented to the jury as a justification for what may well be a flawed single theory that was presented to the jury. They aren't alternative theories. They're factual inputs. The damages model that was used was the hypothetical negotiation. What would TCL have been willing to pay? Because what is the value of this feature to TCL? Why is it that the actual profits that TCL made are used as the inputs for what the hypothetical negotiation would have been ex ante? That confused me, because I thought in cases like Aquashield, we explained pretty clearly that you're not supposed to work ex post in that way and just immediately assume that ex ante, the defendants would have made the very profits that they actually made. You don't know that in the first instance. Right. Because this is the real world of the hypothetical negotiation. In the hypothetical negotiation, TCL shows up to get a license for this patent. It was uncontroverted in that circumstance, number one, that all its major competitors in the United States, Apple, Samsung, LG, and HTC, have licensed this patent from Ericsson, and they have this feature in their product. So that TCL doesn't have the feature. It's the outlier. Number two, TCL had no ability, and this is also in the record, to modify the Android code. It didn't have that capability. And so third, TCL has to get a license, and the reality is of the survey that if they don't get a license and they have to not use this feature, which allows individual feature-by-feature permissions to be granted or denied to apps, they don't have the same feature everyone else has, they're going to lose 28% of their sales. So when TCL goes to the hypothetical negotiation, that's what they're trying to bargain to avoid. There's an alternative ground, too, though, and that's the willingness to pay. Under the willingness to pay, which is $3.52 a dime more, TCL realizes that their consumers will value this feature in their phones at $3.52. So any outcome in the bargain less than that is an optimal utility-improving solution for TCL. And so we're going back to the hypothetical negotiation, and in the context of that, we've got to look at the real-world situation that TCL was in and why it needed a license. Why don't we turn to the volume issue? Yes, Your Honor. Leaving aside for a moment the waiver question, if this issue is properly preserved, why doesn't this align exactly with a bunch of our other cases where this is just controlling access? Because this... Quite functional claiming. Yes. Because this is a patent that creates an architecture or a structure within a computer to provide a better result to improve the functionality of that computer. So in other words, this allows a user to tell a social media app, I will give access to my camera, but not to my location or my contacts, on an app-by-app, function-by-function basis, which did not previously exist. To accomplish that, the patent sets up a tiered or a layered architecture. And there's three... I'd just like to talk about what is actually claimed. And it seems to me you relied in your brief on a great deal of stuff that wasn't actually claimed. Because the claim, as I understand it, doesn't include a discussion of vertical or horizontal stacks or transport protocols or all of the stuff that you're relying on to justify the 101 analysis. Well, turning to claim one, the first element of the claim sets up an application domain that is separate from the software services component. And, Your Honor, in answering your question, I'm going to first look at the claim language, and then I'm going to turn to the specification for context. Sticking just to the claim language for now. We have an application domain that is separate from the software services component. So you have an application... The three layers are the application domain, the interception module, or, excuse me, the interface module, and then, finally, the software services. The application are the apps. We can think of it that way. The software services are the things like the camera, the Wi-Fi functionality, the other things on your phone that the app would like to access. The first element provides that the interface component is controlling access by apps to the software services domain. In other words, it sits in between. That's how it controls access. Then, going further down, the interception module in the third element, that is claimed that it intercepts requests for access from the apps, then checks the security module, which holds permissions the user has granted. And then the final element, it says only if the request is granted is the app granted access to the software services, and that confirms that there is this intervening layer. Now, turning to the specification for context, I'd like to point your honors to five or six portions of the specification that I think make clear the layering and also the separation of these different functions. Column 4? I mean, to me, I'm sorry. I mean, it sounds a little bit like a security guard in the lobby of an office building, right? And then a person comes in and wants access to a certain floor, business, or person that works there, and then the security guard's going to check a list. Has this person been approved to come upstairs? Yes or no? If yes, okay, you can walk through and head to the elevator. If not, then you don't get to go in, and so you don't get access. And I know that's a very simple, crude analogy, but to me, that feels akin to what you just described in terms of certain applications wanting to access certain native software on a cell phone, or not even a cell phone, just any system. But it's more than that, because to be able to accomplish the functionality, and this is an apparatus claim, you have to have the architecture in place, which is the separation of the components. That didn't exist. It's when you have the separation, and then you create the interface pathway between the apps and the software services that you have created an architecture that then allows you to put in place these rules and these procedures. I mean, you're not talking about some kind of physical barrier, are you? It is a barrier. It is a barrier that exists in the code, and the specification confirms that. Column 4, lines 37 to 38, states the apps are isolated from the rest of the components and must access those by the interface. The specification discloses figure 3 as showing the actual layering, and it says in addition to a plurality of horizontally portioned functional software units, there are also vertically partitioned software units as well. So it has a vertical partition, which is the software services, the various functions of the phone, can't talk to each other, but there's also a horizontal partitioning, which means that a higher-level layer like the apps cannot communicate or use the software services unless they're granted permission through the interface. So that can happen, not just apps to software services, but also individual services can be singled out. That's the architecture that was created, this horizontal and vertical partitioning that's described at column 5, lines 23 to 46, and also in column 5, lines 58 to 65, and in column 7, lines 1 through 25, that allows then the functionality to occur. And that's what I did not understand, the discussion in column 5, with the layered stacks, why does that make a difference to this code? Because it's a computer architecture, like the court has approved in ENFISH and the other cases that we've cited. Why does that make the accessing of the native software easier or more efficient or, I don't know, higher-performing, more accurate? It didn't exactly pop when I read it. Okay, and I apologize if we didn't communicate it well. If you had, for instance, a situation where, like in the prior art, apps would run in a sandbox, they couldn't use anything on the phone resources, and then you were to say, well, we'll get rid of the sandbox, then it gets to use everything. The only way you can accomplish app by app and service by service access, right? In other words, the ability to allow a social media app to access camera but not location or, you know, microphone or other things. The only way you can do that is to have this partitioning. And the app can only access a software services component if it's allowed, and it's that specific software services component. That architecture, that separation, did not exist in the prior art. And the rules for the separation are contained in column 5 and column 6 for how that is accomplished. Where is that in the claim? Which words should I look at and see? Yes. This, what I know in your briefing you've referred to is fine granularity. Right. And keeping in mind, the claims are read in the context of the specification. You can find it in the first element, a software services component and an interface component, which are set out separately. The last element says we're in the requesting application domain software is granted access to the software services component via at least one interface if the request is granted. That's the control part of it. But it also has an access controller for controlling access to the software services component. And I think controlling access in the context of the specification means apps don't get to access this unless the request is granted. That's the wall that is set up. By requesting application domain software via the at least one interface. So the structure that's set up is apps are separate from software services. And software services are the functions of the phone that an app wants to use. They can't access them, and they can only access them through the interface if permission is granted. That's a software architectural structure that is being set up in this patent. And I think that is far more than abstract. That takes it now to the level of a new result. The result being... And the patent also talks about cost and other savings and efficiency of programming in it. But in addition to that, it allows users to have a new function, which is app-by-app, service-by-service ability to grant and deny permissions in real time when the app is looking to invoke the services of the mobile phone. So it's the phrase for controlling access to the software services component that I should be looking at. And then when I look at that, I should think about that software architecture that's being described in column five. Yes, and the access controller is set up for having an interception module. So the concept of interception is there, which means... It means receiving a request to access. Right. Before... Interception means before the software services can be invoked. So it stands in the way, interception. And a decisioning entity for determining if the request should be granted. And then the last element, which is access is granted if the request passes or if the request is granted. So I think that is what is set up. It's both rules, but it's more than that. It's the actual partitioning or the layering of the software. And the layering is discussed in detail through columns five, six, and seven of the patent. It's very clear that the layering and the partitioning was extremely important in how the software was set up. Okay, thank you. Thank you, Your Honors. We'll restore two minutes in the back. Three quick points, Your Honor. I think that, as you saw, my friend from Erickson was struggling to explain why the claims would be eligible. Every time that the court asked about particular elements of the claims, what did my friend do? He went to the specification. There's simply nothing in the claims that makes this eligible. In fact, when he was referring to the separate architecture, he again had to go to the specification to explain how they were different. But as I noted, at trial, before the jury, the expert collapsed all of these elements into nothing more than a gateway. So that's the first point on eligibility. On damages, the point I would make is whether or not any of the three analyses are considered. We submit only the first to be considered, but whether or not all of them are, how can a survey that results in 28% of the value of a mobile phone be a correct apportionment? What we had here is we had TCL makes mobile phones, but we don't have the operating system. We get the operating system from Google, and that Google operating system has one feature on it that is the feature of limited accessibility for applications. That's the claim feature. How can, of the thousands of things on the phone, including ability to make a call and having a photo and everything else, 28% of the value of that be appropriately apportioned? That would be impossible, and the record shows that. Third point, Your Honors, is on willfulness. On willfulness, there is... Well, wait a minute. You didn't argue willfulness the first time around, so your friend didn't have an opportunity. Fair point, Your Honors. Thank you. I have nothing further unless there's any questions. What do you want to say about the other side's position that the claimed invention is talking about a very specific software architecture, and through that specific software architecture, you can now have, in a granular way, approvals or disapprovals of access to individual software units inside the native code? So none of that is supported in the claim. Your Honor asked whether or not that's in the claim, and I believe my friend from Erickson conceded it's not. Secondly... No, I think he didn't concede that. I think he's making the argument that, yes, when you understand this claim in light of the specification, now all of a sudden you look at a rather intricate software architecture as described in column 5. So what I'm trying to figure out is does that make a difference or not? It does not make a difference that helps Erickson. The one case that he cited before you was the EnFish case, and in the EnFish case, there was a specific self-referential table, a specific type of data structure that was claimed. That type of specificity is simply not in these claims. And even if... I think what my friend from Erickson was trying to do is he was trying to say, well, even if I fail step 1, and it is an abstract idea, somehow I may get step 2, but he also can point to nothing that's a tangible or physical result that's claimed that comes from his claim that would bring it into step 2 as well. So there's really nothing of record that supports the eligibility on either one of those, Alice 1 or Alice 2. Thank you.